**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

ComputerUser.com, Inc., Civil File No. 02-832 (MJD/JGL)

Plaintiff,

v. **MEMORANDUM AND ORDER**

Technology Publications, LLC,
SexiestGeekAlive.com, Inc., a/k/a
Sexiest Geek Alive, LLC, and
David Richards,

Defendants.

---

This matter is before the Court on (1) Plaintiff's Motion for Preliminary Injunction, and (2) Defendants' Motion to Dismiss for lack of personal jurisdiction, or alternatively, for a transfer of venue. For the reasons that follow, the Court denies Defendants' motion and grants Plaintiff's motion.

## BACKGROUND

Plaintiff ComputerUser.com, Inc. in Minneapolis, Minnesota, is the owner and publisher of COMPUTERUSER magazine. COMPUTERUSER is a monthly publication distributed to computer technology users in eighteen metropolitan cities throughout the United States, with a combined circulation of over 900,000 magazines. Its content incorporates uniform national editorial content, art work and illustrations, with local editorial content, art work and illustrations developed for each metropolitan market. ComputerUser.com either publishes COMPUTERUSER directly, or through an independent

FILED 7-22-02
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

publisher subject to a license agreement with ComputerUser.com.

ComputerUser.com is also the exclusive owner of the "Computer User" mark. "Computer User" is registered with the United States Patent & Trademark Office ("PTO") as a trademark (number 1,675,837) and a service mark (number 2,188,730). "Computer User" is also registered as a trademark and service mark with the Minnesota Secretary of State (number 8,902). The "Computer User" mark has been used in commerce throughout Minnesota and the United States since August 26, 1982. According to Plaintiff, the mark is widely known throughout the country and the most valuable asset of ComputerUser.com.

Defendant Technology Publications is a Texas limited liability company that publishes and distributes COMPUTERUSER magazine within the State of Texas. Technology Publications also owns and operates the Internet website at www.txcu.com. Defendant Sexiest Geek Alive, LLC, is a company whose sole purpose is to hold the "Sexiest Geek Alive" contest for computer geeks. Sexiest Geek Alive owns and operates the Internet website located at www.sexiestgeekalive.com. Defendant David Richards ("Richards") is President of Technology Publications, LLC, and CEO of Sexiest Geek Alive, LLC.

Technology Publications entered into a License Agreement for the use of the "Computer User" mark and the national editorial content, art work and illustrations of ComputerUser.com, to publish and distribute a COMPUTERUSER magazine within the State of Texas. Furthermore, an Internet License Agreement granted Technology Publications a license to use the "Computer User" mark and editorial content designated by

ComputerUser.com as localized electronic version materials. Thereafter, on January 6, 2000, as part of an agreement by which ComputerUser.com purchased most of Technology Publications' assets, ComputerUser.com, Technology Publications, and Richards entered into a License Agreement Amendment that limited Technology Publications' license territory to the Austin-San Antonio, Texas, area.

ComputerUser.com created various publication standards from its office in Minneapolis that were to be used by Technology Publications and Richards. Plaintiff asserts that Technology Publications and Richards deviated substantially from these standards by, among other things, the unauthorized alteration of the "Computer User" trademark by incorporating an outline of the state of Texas within the logo and using incorrect colors and fonts; the reduction in size and dimensions of the publication; the alteration of the cover page by changing the colors and resizing; the use of incorrect type sizes and fonts throughout the magazine; the alteration of copyrighted editorial content, art work, and illustrations by altering headlines, removing entire portions of articles, and changing art work; and the unlawful removal of the credit line from editorial content. Plaintiff asserts that between September 1998 and February 1999, James Mathewson ("Mathewson"), Editor of COMPUTERUSER, called Richards approximately once a month to explain in detail how Technology Publication's version of COMPUTERUSER deviated from the publication standards of ComputerUser.com, and how to conform to those standards in the future. According to Plaintiff, after February 1999, Technology Publications and Richards appeared

to take substantial steps toward complying with those publication standards.

Then, in April 2000, ComputerUser.com altered its look and format, and accordingly, its national publication standards. The Minneapolis office notified Technology Publications and Richards of these new standards. From April 2000 to October 2000, Technology Publications once again deviated from these standards. Once again, Mathewson had monthly telephone conversations with Richards regarding these deviations and methods for conforming to the publication standards. These deviations began anew on June 2001 and continued to the present.

In September 2001, ComputerUser.com President Charles Thell ("Thell") discovered that Technology Publications and Richards had contacted ComputerUser.com's current advertisers and other potential advertisers in order to sell advertising space in COMPUTERUSER publications throughout the country. Plaintiff alleges that Technology Publications and Richards are holding themselves out to the public as a national, informal advertising agency. Plaintiff contends that Technology Publications and Richards have acquired national advertising customers for the purpose of placing advertisements for those customers in various computer publications across the United States. According to Plaintiff, these publications include those owned and operated by ComputerUser.com, ComputerUser.com licensees, and ComputerUser.com's competitors. Technology Publications and Richards utilize the "Computer User" mark in connection with their advertising agency business, and display that mark prominently at the top of billing invoices

to advertisers secured through their advertising agency. Furthermore, Plaintiff contends, Technology Publications and Richards have prominently associated the "Computer User" mark with pornography. Plaintiff asserts that such use has a negative impact on the goodwill and quality of the "Computer User" mark.

On February 19, 2002, Thell sent correspondence to Richards regarding the most serious deviations from the publication standards of ComputerUser.com. Technology Publications and Richards failed to respond. On April 17, 2002, Thell sent a Notice of Termination regarding the License Agreement to Technology Publications and Richards. Plaintiff asserts that Richards sent an email on May 20, 2002, indicating that he no longer published a COMPUTERUSER in the Austin-San Antonio area. Thell also received an anonymous email dated May 20, 2002, implying that Technology Publications' and Richards' former website was no longer active. On June 25, 2002, Richards contacted Brad Roberts ("Roberts"), an employee of ComputerUser.com in Dallas, Texas. Richards informed Roberts that he intended to continue publishing COMPUTERUSER in San-Antonio, Texas, and he was "not going to quit publishing just because we tell him to." (Roberts Aff. ¶ 2). Roberts informed Thell of this information. On June 28, 2002, Thell traveled to Austin and discovered that Technology Publications and Richards had published a June 2002 issue in Austin, Texas, using the "Computer User" mark. Additionally, the Internet site at www.txcu.com also contains the "Computer User" mark and other false information relating to the "Computer User" mark and ComputerUser.com.

Sexiest Geek Alive, LLC, is located at the same address as Technology Publications. According to Plaintiff, between 1999 and 2001, Richards initiated several telephone conversations to Frank Sisser ("Sisser"), publisher of COMPUTERUSER magazine, and Mathewson in Minneapolis to suggest that COMPUTERUSER publications throughout the nation sponsor the Sexiest Geek Alive contest, a national contest to select the "sexiest geek alive." Both Mathewson and Sisser concluded that the contest was not the proper image to be associated with a business and computer technology publication. Mathewson and Sisser repeatedly indicated to Richards that ComputerUser.com and the "Computer User" trademark should not be associated with the Sexiest Geek Alive contest. According to Plaintiff, Richards refused to cease his efforts for ComputerUser.com's sponsorship of the contest. On November 20, 2001, Richards informed Thell during a telephone conversation that the contest would be a promotional opportunity for ComputerUser.com and he desired to have ComputerUser.com sponsor the contest. Richards also sent an email to Thell with promotional materials. Plaintiff again determined that the Sexiest Geek Alive contest did not fit the image that COMPUTERUSER publications portrayed to its readers and advertisers. ComputerUser.com again informed Richards it did not intend to sponsor the event or have the "Computer User" mark or ComputerUser.com associated with the Sexiest Geek Alive contest. Richards and Sexiest Geek Alive nevertheless used the "Computer User" mark in connection with the Sexiest Geek Alive contest.

Plaintiff now moves for a preliminary injunction to enjoin Defendants from using the

"Computer User" mark. Defendants move to dismiss Plaintiff's claims for lack of personal jurisdiction, or alternatively, for a transfer of venue. The Court will address each issue in turn.

## DISCUSSION

### A. Personal Jurisdiction

To defeat a motion to dismiss for lack of personal jurisdiction, the nonmoving party need only make a prima facie showing of jurisdiction. Dakota Indus., Inc. v. Dakota Sportswear, Inc., 946 F.2d 1384, 1387 (8th Cir. 1991). As this Court is relying solely on the pleadings and affidavits, the Court must look at the facts in the light most favorable to the nonmoving party, and resolve all factual conflicts in favor of that party. Id.

In analyzing personal jurisdiction, this Court must first examine whether personal jurisdiction is proper under the forum state's long-arm statute. Aftanase v. Econ. Baler Co., 343 F.2d 187, 190 (8th Cir. 1965). If the statutory requirements are satisfied, the Court must then address whether exercising personal jurisdiction comports with due process. Id. "Although the reach of the state long-arm statute is a question of state law and federal courts are required to accept the interpretation given the statute by the state supreme court, the extent to which the reach of the long-arm statute is limited by due process is a question of federal law." Scullin Steel Co. v. Nat'l Ry. Util. Corp., 676 F.2d 309, 311 (8th Cir. 1982).

The Minnesota Supreme Court has held that Minnesota's long-arm statute should "extend the personal jurisdiction of Minnesota courts as far as the Due Process Clause of the

federal constitution allows." Valspar Corp. v. Lukken Color Corp., 495 N.W.2d 408, 410 (Minn. 1992). Therefore, Minnesota's long-arm statute will be satisfied as long as due process requirements are met. Id. Due process requirements are satisfied when a nonresident has sufficient "minimum contacts" with the forum state so that personal jurisdiction over the nonresident is consistent with "traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). When a forum state seeks to assert specific jurisdiction over a nonresident defendant, the defendant has "fair warning" of suit in the forum if the defendant has "'purposefully directed' his activities at residents of the forum...." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985) (citation omitted).

In determining whether a defendant has enough contacts with the forum state to justify maintaining personal jurisdiction, the Court applies a five factor test. The factors are (1) the quantity of the defendant's contacts with the forum state; (2) the nature and quality of the contacts; (3) the relationship between the cause of action and the contacts; (4) the state's interest in providing a forum for the litigation; and (5) the convenience of the parties. Aftanase, 343 F.2d at 197. The first three factors should be given primary consideration; the last two factors are secondary. Marquette Nat'l Bank v. Norris, 270 N.W.2d 290, 295 (Minn. 1978). Doubts should be resolved in favor of jurisdiction. Hardrives, Inc. v. City of LaCrosse, 240 N.W.2d 814, 816 (Minn. 1976); Viking Eng'g & Dev., Inc. v. R.S.B. Enter., Inc., 608 N.W.2d 166, 169 (Minn. Ct. App. 2000).

In the present case, Plaintiff has presented sufficient evidence to satisfy these requirements as to each Defendant. With respect to Defendants Technology Publications and Richards, the facts of the present case fall squarely within the Supreme Court's decision in Burger King Corp. v. Rudzewicz, decided more than 15 years ago. 471 U.S. 462 (1985). In that case, Burger King Corporation, with its franchise headquarters located in Miami, Florida, filed suit for breach of franchise obligations and trademark infringement in federal district court in Florida against John Rudzewicz ("Rudzewicz"), a Michigan resident and co-owner of a Burger King franchise located in Michigan. Id. Rudzewicz had no physical ties to Florida other than his partner's brief training course in Miami. Id. at 479. Nevertheless, Rudzewicz had entered a 20-year franchise contract with Burger King to operate a restaurant in Michigan. Id. at 462. Pursuant to that contract, Rudzewicz was licensed to use Burger King's trademarks and service marks in a standard Burger King facility. Id. The franchise relationship and other business practices were governed by standards established in Florida. Id. The franchise contract also provided that Florida law governed. Id. Monthly fees and all relevant notices were to be sent by the franchisee to the headquarters in Miami. Id. The parties engaged in many negotiations before and after signing the franchise contract. Id. At some point after obtaining the franchise, Rudzewicz and his partner were unable to remit their monthly fees to headquarters. Id. at 468. Headquarters sent them notices of default, and the parties engaged in prolonged negotiations by mail and telephone. Id. Unable to resolve these issues, headquarters terminated the franchise and ordered Rudewicz and his

partner to vacate the facility. Id. Rudewicz and his partner refused to comply, and they continued to occupy and operate the Burger King restaurant. Burger King filed suit, and ultimately prevailed on the merits. Id. at 462. The Eleventh Circuit reversed on appeal, holding that jurisdiction in this case would "offend the fundamental fairness which is the touchstone of due process." Id. After careful consideration, the Supreme Court determined that substantial record evidence supported the assertion of personal jurisdiction in Florida over Rudzewicz. Id. at 478. The Court reasoned that the parties' relationship grew out of a contract that had a substantial connection to Florida, and therefore, personal jurisdiction in Florida was proper. Id.

Similarly, in the present case, personal jurisdiction over Technology Publications and Richards in Minnesota is proper. In 1997, Carl Harris ("Harris"), a current owner of Technology Publications, initiated telephone contact with Sisser in Minneapolis, Minnesota, to discuss becoming a licensee of COMPUTERUSER magazine. Harris planned to purchase part of Technology Publications, Richards' company, and have Richards run the daily operations of the publication in Austin, Texas. The subsequent telephone negotiations for granting Technology Publications a license to publish a COMPUTERUSER magazine in Texas occurred between Sisser in Minneapolis and Harris in St. Louis, Missouri. None of these negotiations occurred in or with anyone from Austin, Texas. On December 8, 1997, Sisser signed the License Agreement in Minneapolis, Minnesota, and then forwarded it to Harris in Missouri for signature, who then forwarded it to Richards in Texas for signature.

The License Agreement contains a Minnesota choice-of-law clause. The License Agreement also indicates that much of the pertinent aspects of the parties' relationship will be governed by ComputerUser.com's operations in Minneapolis, Minnesota. For example, the terms of the License Agreement provide that the standards and quality of the publication established in Minnesota will be utilized. Under the Agreement, Technology Publications agrees to "conform strictly" to the standards of quality and trademark marking established by ComputerUser.com in Minnesota. The licensee also agrees to submit sample publications for inspection to Minnesota. The License Agreement provides that if Technology Publications fails to meet those standards, ComputerUser.com in Minnesota will send notification. Further, in the absence of written standards, Technology Publications will follow the standards used by ComputerUser.com in Minnesota.

ComputerUser.com in Minnesota agrees to provide Technology Publications with the galleys, artwork, illustrations, color separations, and electronic copies of all editorial content and its media kit. Moreover, ComputerUser.com will assume liability and hold harmless Technology Publications for lawsuits arising from use of the galleys. In turn, Technology Publications is required to make monthly royalty payments to ComputerUser.com in Minnesota, equal to a percentage of its monthly advertising revenue. Technology Publications is also required to send to ComputerUser.com in Minnesota a detailed, monthly, written statement regarding its advertising revenue.

Although Technology Publications and Richards were required to send royalty

payments to ComputerUser.com in Minnesota, they became delinquent on several occasions and are currently delinquent. Peterson Aff. ¶ 4. Plaintiff and Richards also discussed on numerous occasions the failure of Technology Publications to comply with the publication standards of ComputerUser.com. Indeed, the record is replete with evidence of the parties' negotiations and conversations both before and during the parties' contractual relationship.

The nature and quality of these activities by Technology Publications and Richards are far more than "random," "fortuitous," or "attenuated" contacts with the State of Minnesota. Physical presence is not necessary for personal jurisdiction, and the lack of physical presence is not dispositive. Burger King, 471 U.S. at 476. Technology Publications and Richards entered into a License Agreement and contractual relations that endured for more than four years. They were aware that the contractual relationship was governed by Minnesota law. "Although such a provision standing alone would be insufficient to confer jurisdiction," this Court must give that provision sufficient weight when combined with the relationship Technology Publications and Richards established with ComputerUser.com in Minnesota. Id. at 482. Indeed, this lawsuit grew out of a dispute over the License Agreement and use of the "Computer User" mark, which has a substantial connection to Minnesota. Technology Publications and Richards reached out beyond Michigan to establish and maintain this contractual connection with Minnesota. This deliberate affiliation with the forum state makes it reasonably foreseeable that Technology Publications and Richards could be haled into court in Minnesota.

With respect to Sexiest Geek Alive, this Court must conduct a slightly different analysis. On the one hand, Richards initiated several contacts with ComputerUser.com in Minnesota via telephone and email in an attempt to solicit its sponsorship of the Sexiest Geek Alive contest. Richards also sent promotional materials to ComputerUser.com in Minnesota to further his efforts. Thereafter, Plaintiff alleges, Richards and Sexiest Geek Alive used the "Computer User" mark in association with the contest, despite ComputerUser.com's express refusal to grant permission to use its mark for that purpose. The present lawsuit is directly related to the subject matter of that contact. To this extent, it could be said that Sexiest Geek Alive purposefully directed its activities to the forum state such that it could anticipate being haled into court here. Indeed, even a single act can support jurisdiction, given a substantial connection with the forum. Burger King, 471 U.S. at 475, n. 18.

However, even assuming those contacts are not sufficient to confer jurisdiction, the Court finds that the Internet activities of Sexiest Geek Alive are sufficient to establish jurisdiction. In order to determine whether the exercise of jurisdiction is constitutional with respect to Internet activity, the Court must assess the nature and quality of commercial activity that Sexiest Geek Alive conducts over the Internet. Mink v. AAAA Dev., 190 F.3d 333, 336 (5th Cir. 1999). The Court must assess such activity along a sliding scale in which Internet activity falls into a spectrum of three areas. Id. On one end of that spectrum, "a defendant clearly does business over the Internet by entering into contracts with residents of other states." Id. Accordingly, such activities generally support the exercise of personal

jurisdiction. Id. On the other end of the spectrum, a defendant operates a passive website that "does nothing more than advertise on the Internet." Id. Such activities generally do not give rise to the exercise of personal jurisdiction. Id. In the middle of the spectrum, a defendant's website "allows a user to exchange information with a host computer." Id. In those cases, the activities are assessed to determine the level of "interactivity" and the "commercial nature of the exchange of information that occurs" at the website. Id.

The Sexiest Geek Alive website received over 8 million "hits" in only two months in 2001. The Sexiest Geek Alive contest received over 18,000 contestant applications for the 2001 pageant, and registration to become the Sexiest Geek Alive was open to all residents of the United States, including Minnesota. The Sexiest Geek Alive website at sexiestgeekalive.com contains various interactive features. In order to participate in the contest, potential candidates must complete an online application. The online application queries numerous personal questions such as name, age, address, telephone number, Internet home page, birth date, gender, and employment phone number and address. The online application asks numerous knowledge questions and requires potential candidates to answer several essay questions. The website also contains a message board that requires users to sign up in order to participate. Registering for the message board requires a user to answer questions about specific personal details, including name, address, birth date, gender, occupation, industry, household income, address, email address, and personal interests. Finally, sexiestgeekalive.com offers free email accounts. In order to register for an email

account, the user must again provide a variety of personal information.

With all of these activities, the user may request regular transmission of information, special offers, and other promotional material. In many cases, upon registering for these activities, the boxes requesting the information, special offers, and promotional material are already checked "Yes." Plaintiff contends that this Internet site does not exist merely to promote the Sexiest Geek Alive contest, but to sell advertising by gathering personal data from its users. Plaintiff contends that a reasonable amount of discovery will reveal that Sexiest Geek Alive's Internet activities reached residents of Minnesota.

The Court again recognizes that jurisdiction need not be proved by a preponderance of the evidence until trial, the nonmoving party need only make a prima facie showing of jurisdiction, and all factual conflicts should be resolved in favor of the nonmoving party. Dakota Indus., 946 F.2d at 1387. Construing the facts in the light most favorable to Plaintiff, the Court concludes that the quality and quantity of Sexiest Geek Alive's contacts with Minnesota exceed the passive end of the spectrum. See e.g., State v. Granite Gate Resorts, Inc., 568 N.W.2d 715 (Minn. Ct. App. 1997) (finding that a nonresident defendant was subject to personal jurisdiction in Minnesota based on its actions of advertising on the Internet and developing from the Internet a mailing list that included one or more Minnesota residents). These contacts and the underlying cause of action are interrelated, as ComputerUser.com has alleged that Sexiest Geek Alive and Richards used its trademark in connection with advertising and promoting the contest and website. See e.g., Tech Heads,

Inc. v. Desktop Serv. Ctr., Inc., 105 F. Supp.2d 1142, 1151 (D. Or. 2000).

Finally, the exercise of personal jurisdiction is reasonable as to all Defendants. Although Defendants argue that they will be inconvenienced by a suit in Minnesota, "the convenience issue is rarely dispositive." Marquette Nat'l Bank, 270 N.W.2d at 295. Minnesota "obviously has an interest in providing a forum for (its) resident allegedly wronged." Id. For all these reasons, this Court's exercise of personal jurisdiction over Defendants comports with due process.

**B. Transfer of Venue**

Alternatively, Defendants move to transfer venue. The Court may transfer a civil action to another district where the action could have been initiated if transfer would promote the convenience of the parties and witnesses and the interest of justice. 28 U.S.C. § 1404(a). In this case, Defendants assert that it would be inconvenient to litigate in this forum. The Court notes, however, that it would be no more convenient for Plaintiff to litigate this case in Texas than for Defendants to litigate this case in Minnesota. Defendants' motion to transfer this case would merely shift the inconvenience to Plaintiff. Plaintiff has demonstrated that many witnesses and relevant documents are located in Minnesota. Moreover, although the presence of a choice-of-law clause is not dispositive, it is another factor in this case that weighs in favor of venue in Minnesota rather than Texas. See Schmidt Printing, Inc. v. Impact Publ'g, Inc., No. 02-48, 2002 WL 1285113, at *1 (D. Minn. June 5, 2002). With respect to the interests of justice, courts consider many factors including the

familiarity of the two courts with the law to be applied, the ability of the parties to bear the expense of litigating in a distant forum, judicial economy, the plaintiff's choice of forum, obstacles to a fair trial, and each party's ability to enforce a judgment. See Graff v. Qwest Communications Corp., 33 F. Supp.2d 1117, 1121 (D. Minn. 1999). It is undisputed that this Court is in the best position to apply Minnesota law. It is also undisputed that Plaintiff chose this forum. Defendants do not contend that they would not get a fair trial in Minnesota, and indeed, there is no suggestion that such is the case. Plaintiff suggests that each party is able to bear its own expense of the litigation, and that because Defendants caused it financial harm, equity weighs in its favor to litigate in Minnesota. Based on all these factors and basic judicial economy, a transfer of venue to Texas is not warranted.

## C. Preliminary Injunction

Plaintiff moves for a preliminary injunction to enjoin Defendants from using its "Computer User" trademark. As an initial matter, Defendants argue that the Court should deny Plaintiff's motion because the alleged infringement has ceased. The website at www.txcu.com is no longer in service, and Defendants claim that they no longer use the ComputerUser.com, Inc. and "Computer User" trademark in connection with any publication, advertisement, or promotion. Defendants argue that because they ceased the alleged infringing conduct, Plaintiff's motion for temporary injunctive relief is moot. It is well settled, however, that a defendant's voluntary cessation of conduct does not render a case moot if the defendant is free to return to the allegedly improper behavior at any time. U.S.

v. W.T. Grant, Co., 345 U.S. 629, 632 (1953). In this case, the Court is also mindful of Plaintiff's claim that Defendants ceased alleged unauthorized use of the mark in the past, only to resume it later. For these reasons, it is proper for this Court to consider Plaintiff's motion for preliminary injunction.

To determine whether to grant preliminary injunctive relief, the Court evaluates (1) the probability of petitioner's success on the merits; (2) the threat of irreparable harm to the petitioner; (3) the threat of harm to the respondent balanced against the harm to the petitioner; and (4) the public interest. Dataphase Sys., Inc. v. CL Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981) (en banc). The petitioner bears the burden of proof on the four factors. Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418 (8th Cir. 1987).

**1. Probability of Success on the Merits**

In order to prevail on its trademark infringement claim, ComputerUser.com must prove ownership of a valid trademark and that Defendants' use of its trademark is likely to cause confusion. Graham Webb Int'l v. Helene Curtis Inc., 17 F. Supp.2d 919, 926 (D. Minn. 1998). Registration of a trademark upon the principal register is prima facie evidence of the validity of the mark, the registration of the mark, the registrant's ownership of the mark, and the registrant's exclusive right to use the mark in commerce. See 15 U.S.C. § 1057. Moreover, a mark that meets certain requirements, primarily continuous use for five years after registration, becomes incontestable. See 15 U.S.C. § 1065. Incontestability provides conclusive evidence of the mark's validity, its registration, the registrant's

ownership in the mark, and the registrant's exclusive right to use the mark in commerce. See 15 U.S.C. § 1115(b).

In order to determine whether a likelihood of confusion exists in Defendant's use of the mark, the Court must consider (1) the strength of the infringed mark; (2) the alleged infringer's intent to pass off its product as those of another; (3) whether the type of product involved and its costs and conditions of purchase tend provide consumers with an opportunity to eliminate any confusion that would otherwise exist; (4) whether the marks, examined as a whole, are similar; (5) the degree to which the products compete with one another; and (6) evidence of actual confusion. SquirtCo v. Seven-Up Co., 628 F.2d 1086, 1091 (8th Cir. 1980).

ComputerUser.com asserts that it is the owner of the "Computer User" mark, which has been used in commerce since August 26, 1982. The mark is registered on the principal register with the PTO and in the State of Minnesota. Furthermore, ComputerUser.com asserts that Technology Publications and Richards were aware of the mark's registered status, given the language contained in the License Agreement to that effect. Plaintiff asserts that its mark in incontestable. Defendants do not dispute this evidence.

Plaintiff also argues that its mark is strong. Plaintiff contends that Richards, Harris, and Technology Publications sought licensee status due to the strength and recognition value of the "Computer User" mark within the computer publications field. Plaintiff asserts that the strength of its mark enabled them to maintain a competitive presence in major

metropolitan markets throughout the United States and acquire advertisers and readers. These claims are undisputed by Defendants. Based on the facts currently before this Court, Plaintiff prevails in its argument that the "Computer User" mark is strong.

Next, Plaintiff argues that the mark used by Technology Publications is virtually identical to its mark. The similarity of a mark is based on an examination of the marks as a whole. Id. In this case, upon examination of the "Computer User" mark and the mark used by Defendants, the Court concludes that the marks are similar. Both marks use the words "Computer User" in reference to and connection with their respective magazine publications. Both marks appear in small caps without spacing between the words. Moreover, both marks utilize a similar multi-color visual scheme.

Plaintiff further argues that Technology Publications and Richards are in competition with ComputerUser.com. "[C]onfusion, not competition, is the touchstone of trademark infringement. It is error to assume that trademark law protects against use of a mark only on directly competitive products." Mut. of Omaha Ins. Co. v. Novak, 836 F.2d 397, 399 (8th Cir. 1987). In this case, Plaintiff has alleged that Technology Publications and Richards were terminated as licensees but nevertheless continued to publish a COMPUTERUSER magazine and display the "Computer User" mark on their websites. Such activity is directly competitive to ComuterUser.com and its interests. Additionally, Plaintiff alleges, Technology Publications and Richards used the "Computer User" mark in connection with their advertising business, through which they solicited national advertisers for not only

COMPUTERUSER publications, but also competitors' publications. In connection with the Sexiest Geek Alive contest, the "Computer User" mark was used without permission to promote a contest against ComputerUser.com's competitive interests.

Plaintiff asserts that Defendants have attempted to pass off its goods as those of ComputerUser.com. If an alleged infringer chooses a similar mark with knowledge of the prior mark, such knowledge may raise an inference of an intent to trade upon a plaintiff's goodwill. Aveda Corp. v. Evita Mktg., Inc., 706 F. Supp. 1419 (D. Minn. 1989). Such an inference would clearly arise where the parties have had a prior relationship. Insty*Bit, Inc. v. Poly-Tech Indus., Inc., 95 F.3d 663, 671 (8th Cir. 1996). ComputerUser.com argues that Defendants are trading on the goodwill associated with the "ComputerUser" mark, which has attracted consumers and advertisers for 20 years, for its own financial advantage. Given the parties' prior relationship and the factual circumstances giving rise to the underlying claims, the Court concludes that the evidence developed at this time supports the conclusion that Defendants attempted to pass off its goods as those of ComputerUser.com.

Finally, Plaintiff contends that Defendants' activities create a likelihood of confusion. Plaintiff has presented no evidence of actual confusion. However, discovery has not begun in this case. Plaintiff maintains that it will be able to prove at trial incidents of actual confusion among consumers and advertisers.

Evidence of actual confusion is not necessary for a finding that a likelihood of confusion exists. Hubbard Feeds, Inc. v. Animal Feed Supp., Inc., 182 F.3d 598, 602 (8th

Cir. 1999). Visual inspections by the court are permissible to determine likely confusion. Calvin Klein Cosmetics Corp. v. Lenox Lab., Inc., 815 F.2d 500, 504 (8th Cir. 1987). Moreover, "[i]ntent on the part of the alleged infringer to pass off its goods as the product of another raises an inference of likelihood of confusion." SquirtCo, 628 F.2d at 1091. Plaintiff argues that because the marks are virtually identical, the propensity for confusion is great. Plaintiff maintains that the overall appearance of Technology Publications' COMPUTERUSER, which utilizes a mark virtually identical to that of "ComputerUser.com," is inherently confusing. Moreover, Plaintiff contends, the Texas Computer User website at www.txcu.com is deliberately confusing. If a consumer enters that website and selects "current issue," the consumer actually leaves the www.txcu.com website and visits Plaintiff's website at www.computeruser.com. Plaintiff posits that unsuspecting consumers would be unaware that Technology Publications' "current issue" is actually a hypertext link to Plaintiff's website. Finally, Plaintiff argues that Defendants' use of the mark in all cases gives consumers the impression that "Computer User" is associated with Defendants' products. Defendants do not dispute Plaintiff's contentions.

Based on these arguments and a visual inspection of the marks, Plaintiff has met its burden of demonstrating probable success in proving likelihood of confusion. Having preliminarily found a probability of success on the merits in Plaintiff's favor on the trademark infringement claim, the Court need not address Plaintiff's claims for trademark dilution, false advertising, false designation, and breach of contract.

**2. Threat of Irreparable Harm**

In trademark cases, courts may presume irreparable injury from a finding of probable success in proving likelihood of confusion. Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc., 633 F.2d 746, 753 (8th Cir. 1980). Courts may also consider the potential loss of control over the quality of the plaintiff's product and the risk of damage to the plaintiff's reputation. Woodroast Sys., Inc. v. Rest. Unlimited, Inc., 793 F. Supp. 906, 918 (D. Minn. 1992). Here, Plaintiff has demonstrated both a likelihood of confusion and the potential loss of goodwill and control over the quality of its mark and product. Accordingly, Plaintiff is entitled to the presumption of irreparable harm.

**3. Balance of Harms**

The Court also must consider the harm of granting an injunction compared to the harm of denying the injunction. Here, the "Computer User" mark belongs to ComputerUser.com, and accordingly, Plaintiff would be damaged by infringement of the mark. The potential harm to Plaintiff includes intangible effects such as loss of goodwill and injury to its reputation, which may not be remedied by money damages. Hillerick & Bradsby Co. v. Christian Bros., Inc., 943 F. Supp. 1136, 1142 (D. Minn. 1996). The potential harm to Defendants is arguably less serious. Technology Publications and Richards were initially authorized to use the mark as a mere licensee. Subsequent use was allegedly unauthorized, as the License Agreement was terminated. Sexiest Geek Alive held no claim to the mark. Accordingly, the Court finds that the balance of harms also favors granting injunctive relief.

**C. Public Interest**

When addressing the public interest factor in the context of trademark infringement, the Court considers the interest in protecting the public from confusion or deception against the interest in maintaining a competitive marketplace. Aveda Corp., 706 F. Supp. at 1432. The "Computer User" mark has been in use 1982. The public's interest in avoiding confusion is served by preventing Defendants' unauthorized use of the mark. Unauthorized use of the mark creates confusion and misappropriates the goodwill that the "Computer User" mark symbolizes. In such cases, the public interest favors injunctive relief. Id.

For these reasons, the Court concludes that the relevant factors weigh in favor of granting a preliminary injunction against Defendants' use of Plaintiff's "Computer User" trademark.

**CONCLUSION**

The Court has reviewed the memoranda of the parties and heard oral argument in this matter. Based on that review and all the files, records, and proceedings herein, the Court concludes that it has personal jurisdiction over each Defendant in this matter, a transfer of venue is not warranted, and a preliminary injunction is warranted. Accordingly, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion to Dismiss, or alternatively, to Transfer Venue (Clerk Doc. No. 14) is **DENIED**;

2. Plaintiff's Motion for Preliminary Injunction (Clerk Doc. No. 5) is

**GRANTED**;

3. Defendants are enjoined from any use of the "ComputerUser" federally registered trademark;

4. Defendants are enjoined from engaging in any publication, advertisement, or promotion which may state or imply any association, connection, affiliation, sponsorship, origin, or approval of or by the publication, advertisement, or promotion of Plaintiff's ComputerUser.com, Inc. or Plaintiff's "ComputerUser" mark;

5. Defendants are enjoined from providing any World Wide Web link or connection of any kind, via the Internet, that purports to link or does in fact link Defendants with the "ComputerUser" mark or ComputerUser.com, Inc.; and

6. Plaintiff shall post a bond with the Clerk of Court in the amount of $5,000 pending final resolution of this matter.

Dated: July 20, 2002

Michael J. Davis
United States District Court Judge